**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEWYORK**
—————————————————————X

**UNITED STATES OF AMERICA,**


        -v.-

                                  **17 CR 398-002(ER)**
                                  **ECF Case**

**ROBERT EXPINEL,**


 **Defendant.**
—————————————————————X


## SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT ROBERT ESPINEL


**THE PASCARELLA LAW FIRM**
**1551 FRANKLIN AVENUE**
**MINEOLA, NEW YORK 11501**
**(516) 741-3476**
**By: James Adam Pascarella, Esq.**
**Attorneys for Defendant ROBERT ESPINEL**

## **TABLE OF CONTENTS**

Table of Authorities.................................................................... ii

Introduction................................................................................ 2

Preliminary Statement............................................................. 3

A Sentence of Probation Is To Be Considered First........................... 7

History And Characteristics Of Robert Espinel................................ 9

Further §3553(a) Considerations……………………………………….. 13

Bases for Variance………………………………………………… 13

Subpart A……………………………………………………………. 13

Subpart B……………………………………………………………. 13

Subpart C……………………………………………………………14

Subpart D…………………………………………………………… 15

Conclusion………………………………………………………....... 16

## TABLE OF AUTHORITIES

**Cases:**

*Cunningham v. United States,*
549 U.S. 270 (2007)……………………………………………….. 6

*Pepper v. United States,*
562 U.S. 4476, 487 (2011)……………………………………… 7

*United States v. Jones,*
573 F. Supp. 2d 744 (2d Cir. 2008)…..………………………….. 7

*United States v. Ministro-Tapia*
470 F.3d 137 (2d Cir. 2006)…………………………………….. 2

*United States v. Parris*
573 F.3d 744 (E.D.N.Y. 2008)…………………………………… 7

*United States v. Sanchez,*
527 F.3d 651 (2d Cir. 2008)……………………………………. 7

*United States v. Seval,*
Slip Op. 2008 WL 4376826 (2d Cir. 2008)…………………….... 7

*United States v. Taylor,*
2008 WL 2332314 (S.D.N.Y. 2008)…..………………………….. 7


**Statutes:**

18 U.S.C. §3553(a)……………………………………………*passim*

18 U.S.C. §3559(a)……………………………………………. 8

18 U.S.C §3561(a)…………………………………………….. 8

18 U.S.C.§ 371……………………………………………..... 2

18 U.S.C. §994(h)…..…………………………………………. 7

18 U.S.C. §994(j)…..………………………………………… 13

**Miscellaneous:**

Hofer, Paul j., *Immediate and Long-Term Effects of United States v. Booker,* 38 Ariz. L. Rev. 425 ............................................................................................. 7

Hofer, Paul J., *The Reset Solution,* 20 Fed. Sent'g. Rep 349 (2008).................... 7

Tonry, Michael, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research (2006)............................................................................... 14

*Sentencing Commission, Adopted Amendments to the Guidelines* (Nov. 1, 2018).. 9

U.S.S.C., *Alternative Sentencing in the Federal Criminal Justice System, at 2-3*.........................................................................................................................*3, 8, 15*

U.S.S.C., *Sourcebook of Federal Sentencing Statistics*......................................... 7

Exhibit A, consisting of letters of recommendation, annexed to the within Sentencing Memorandum is made a part hereof, and it constitutes a single submission on behalf of Robert Espinel.

# INTRODUCTION

"It has been uniform and constant in federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Gall v. United States,* 128 S. Ct. 586, 598(2007), quoting *Koon v. United States,* 518 U.S. 81, 113 (1996). On April 26, 2019, this Court will have the difficult responsibility of imposing sentence on Robert Espinel, who, despite the narrowly-defined violation of law to which he has pled guilty, is an exceprional human being.  With great respect for the independence and integrity of this Court, counsel for Mr. Espinel submits this Sentencing Memorandum in the hope that it will be of value to Your Honor in fashioning an appropriate sentence.  It is respectfully submitted that beyond the admitted violation of 18 U.S.C. §371 and *pro forma* calculations made in accordance with the advisory United States Sentencing Guidelines ("U.S.S.G" or "Guidelines"), the totality of Mr. Espinel as a person should be considered as well.  Once due consideration is made, it is further submitted, it becomes apparent that the Guidelines calculation and consequent sentencing range set forth in the Plea Agreement is drastically more severe than justice requires in this case.  Fortunately, there is a reasonable alternative--a non-Guidelines sentence.  Such a sentence, it will be demonstrated, is sufficient to satisfy the purposes of 18 U.S.C. §3553(a), and, so, consistent with the parsimony clause thereof, the aforesaid severe Guidelines sentence cannot be imposed.  *United States v. MinistroTapia*, 470 F.3d 137 (2d Cir. 2006).

This Memorandum will be dedicated to presenting a more complete picture of Robert Espinel, seeking a sentence that is not "greater than necessary" and establishing why a sentence that is a variance from the Guidelines sentencing range, to wit: a sentence of probation, is appropriate under the law and the circumstances.  (In fact, based on the Sentencing Reform Act, past practice, empirical research and recent United States Supreme Court and Second Circuit Court of Appeals decisions, the first question in most cases in which a prison term is *not statutorily required* should be whether

2

probation will suffice, not how long the defendant should be imprisoned).

One practical way to "get to know" Robert is to learn what others know, think, feel, believe and say about him.  To that end, various and numerous letters are submitted herewith and annexed hereto as Exhibit A.  These letters are from persons who have known Robert Espinel for a period of time from a few years to a lifetime.  Hopefully, they will shed sufficient light on the type of person he is, for they show him as caring and compassionate, giving and charitable, trustworthy, honest, extremely hard working, devoted to family, loyal and a valuable contributing member of his community, and on and on.  Counsel can say that, after representing him for approximately a year and a half and spending countless hours in investigating this case and preparing for trial and sentencing, I have come to know him, and to truly know him is to appreciate how extraordinary a person Robert is.[1]

---

[1] It could be said that this may be considered vouching for counsel's client. It must be said that it is *extremely* unusual for this counsel to make such a statement in the course of a submission on sentencing.  In fact, counsel cannot recall when he has ever made a similar statement and felt so strongly.

# PRELIMINARY STATEMENT

On December 7, 2018, Robert Espinel pled guilty, pursuant to a Plea Agreememt to a violation of 18 U.S.C. §371. The violation involved Robert and others.

The Plea Agreement, executed in court by Mr. Espinel on December 7, 2018 , contains a Guidelines calculation that results in an Offense Level of 15 and a Criminal History Level of I (Based on "0" points). This, according to the Sentencing Table, brings us to a Guidelines sentence range of 10 to 16 months. The aforesaid Guidelines range calculation is confirmed in the Probation Department's Presentence Investigation Report ("PSR"), at paragraph 121.

Starting with its decision in *United States v. Booker,* 543 U.S. 220 (2005), which, among other things, made the Guidelines advisory rather than mandatory in nature, the Supreme Court of the United States has revitalized our system of sentencing, making it more just, fair and realistic by giving district court judges the power to impose sentences that are not greater than necessary to satisfy the statutory purposes of sentences, to consider all of the characteristics of a defendant and circumstances of the offense, to reject the advisory Guidelines and to serve their function in the constructive evolution of responsible sentencing guidelines. *See, Rita v. United States*, 127 S. Ct. 558 (2007). The Supreme Court appears to have gone out of its way to emphasize the foregoing by its decisions in *Spears v. United States*, 129 S. Ct. 840 (2009) and *Nelson v. United States*, 129 S. Ct. 890 (2009). Obviously, the Supreme Court is getting the message across that sentencing is still too Guidelines-centric. *Booker* and its progeny changed the sentencing process and rid judges of the shackles of the formulaic application of the Guidelines which existed pre-*Booker* which improperly confined the judge's ability to consider the human being behind the offense. The Supreme Court has made it clear that the district courts must make an *individualized* assessment based on all the 18 U.S.C. §3553(a) factors and that virtually no area of mitigation is off limits. Indeed, in *Nelson, supra,* in key language, the Court said (citations edited):

4

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. In <u>Rita</u>, we said as much, in fairly explicit terms: "We repeat that the presumption before us is an appellate court presumption…[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."551 U.S., at 351. And in <u>Gall</u> we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable."

It is submitted that the Supreme Court, in *Gall, Kimbrough, Spears and Nelson, supra,* has made extra effort to tell the lower courts that they need not, perhaps even should not, keep gravitating toward the Guidelines. The Guidelines, in fact, should not be the focus, it is submitted, but what should be looked to is the "overarching provision [of §3553(a)] instructing district courts to 'impose a sentence sufficient but not greater than necessary' to achieve the goals of sentencing." *Kimbrough, supra,* at 570. Of course, the district court must "correctly calculate" the Guidelines range, but this is only so a judge can resolve any disputes about Guidelines facts and application issues at the outset, for the guidelines are not only not mandatory, but, as pointed out, above, courts are not to presume they apply or even are reasonable.

Judges are invited to consider arguments that any potential applicable guideline fails to properly reflect §3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way and/or that a different sentence is appropriate regardless. *Rita, supra,* at 2465. District courts "…may vary [from Guidelines ranges] based solely on policy considerations, including disagreement with the Guidelines," *Kimbrough, supra,* at 570), and, when they do, the courts of appeal may not "…grant greater fact-finding leeway to [the Sentencing Commission] than to [the] district judge." *Rita, supra,* at 2463.

Whether a judge may draw any useful advice from a guideline depends first on whether the Sentencing Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough, supra,* at 575. As described in *Rita,* the exercise of this role has two basic components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice, and (2)

review and revision in light of judicial decisions, sentencing data and comments from participants

and experts in the field. *Rita, supra,*2464-65. Where a guideline was not developed based on this

"empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a

sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a  mine-run case."

*Kimbrough, supra,* at 575.  See, also *Spears, supra,* at 843-844.  ("We now clarify that district courts

are entitled to  reject and vary categorically from the crack cocaine Guidelines based on policy

disagreement with those Guidelines").

   The district courts' ability to impose a non-Guidelines sentence based solely on a policy

disagreement with the guideline itself applies to the whole of the Guidelines, not just the crack

guidelines.  Such principle did not originate in *Kimbrough* but in language applicable to all of the

Guidelines in cases preceding that case.  It began in *Cunningham v. California,* 549 U.S. 270 (2007),

where the Supreme Court recognized that the ability of judges to sentence outside the Guidelines

range based solely on general policy objectives, without any fact-finding anchor, is necessary to

avoid a Sixth Amendment violation.  *Cunningham, supra ,*at 279-281.  Then, in *Rita,* the Court held

that because the Guidelines may not be presumed reasonable at sentencing, sentencing judges are

permitted to find that the Guidelines sentence itself fails properly to reflect § 3553(a) considerations,

that the Guidelines reflect unsound judgment or that the Guidelines do not generally treat certain

defendant characteristics in the proper way (*Rita,* 2465, 2468).  Finally, in *Kimbrough, ,*the Court

reiterated that a district court may consider arguments that "the Guidelines sentence itself fails

properly to reflect §3553(a) considerations, or perhaps because the case warrants a different sentence

regardless, courts may vary [from Guideline ranges] based solely on policy considerations, including

disagreements with the Guidelines." *Kimbrough,* at 570.  This ability to disagree as a matter of policy

applies to all guidelines, including guidelines that emanate from congressional actions.  *United States

v. Carr,* 557 F. 3d 93, 106 (2d Cir. 2009) (noting that "the sentencing court has discretion to deviate

from the Guidelines-recommended range based on the court's disagreement with the policy

judgments evinced in a particular guideline"); *United States v. Cavera,* 550F.3d 180, 191 (2d Cir.

6

2009) (*en banc*, all guidelines); *United States v. Seval*, Slip Op. 2008 WL 4376826 (2d Cir. Sept 25, 2008); *United States v. Jones*, 531F.3d 163 (2d Cir. 2008) (all guidelines); *United States v. Sanchez*, 517 F.3d 651, 662-65 (2d Cir. 2008) ("Section 994(h)…, by its terms, is a direction to the Sentencing Commission, not to the courts"); *United States v. Taylor*, 2008 WL2332314(S.D.N.Y June 2 2008); *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008). *See, also, Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue"). (internal quotations and citations omitted).

Rarely do the Guidelines reflect the Commission's "exercise of its characteristic institutional role," referred to, *supra* (at page 2, herein). Many guidelines are not tied to empirical research and data from pre-Guidelines sentencing and from decisions and participants and experts in the field. Hardly ever are they unfettered by politics. The "idealized vision of Commission policy-making [its 'institutionalized role'] is the exception rather than the rule." Hofer, Paul J., *The Reset Solution*, 20 Fed. Sent'g. Rep., 349 (2008). Instead, "the Guidelines mechanism has often been seized by the political branches and directed toward goals other than the purposes of sentencing." *Id.*

## A SENTENCE OF PROBATION IS TO BE CONSIDERED FIRST

Earlier in this Memorandum, it was submitted that where a sentence of imprisonment is not required by statute, the first question should be whether probation is sufficient rather than for how long a defendant should be imprisoned. *See*, pages 2 and 3, *supra*. Congress authorizes probation for a broad range of offenses and offenders—that is, for any offense with a statutory maximum below 25 years, so long as probation is not expressly precluded and the defendant is not sentenced to a non-petty offense at the same time. *See*, 18 U.S.C. §§3561(a) and 3559(a). Even the Guidelines Manual states:

> The Comprehensive Crime Control Act of 1984 makes probation a sentence in and of itself. 18 U.S.C. §3561. Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of punishment for the offense, achieving general deterrence and protecting the public from further crimes by the defendant. U.S.S.G.5B, Introductory Commentary.

This goes largely unnoticed or unused because the Guidelines are biased against probation.  Under the Guidelines, the sentencing court can impose a within-Guidelines sentence of straight probation only at levels 1 through 8 (0 to 6 months). The within Guidelines sentence is at least intermittent confinement, community confinement or home detention at levels 9 and 10 (1 to 12 months), is at least half prison at levels 11 and 12 (8 to 16 months) and is prison only at level 13 or greater (12 months to life). The U.S. Probation Monograph which states that probation "[o]fficers should consider the appropriateness of any available alternatives before deciding to recommend a term of imprisonment," goes unnoticed and unused for the same reason.  Publication 107, at 11-74, Office of Probation and Pretrial Services, Administrative Office of the United States Courts, Revised March 2005.  (It is interesting to note that while only 7.7 percent of defendants received a sentence of straight probation in the Guidelines era, 38 percent of defendants were sentenced to straight probation in 1984,with the rate of probation varying dependent upon the offense.   For example, the rate was 57 and 59 percent for tax offenses and fraud offenses, respectively.  *See,* U.S. Sentencing Commission, 2007 Sourcebook of Federal Sentencing Statistics, Fig. D and U.S. Sentencing Commission, *Fifteen year report,*(citation more fully set out, *supra,* at page 9), at 43.  As a result off *Booker* and its progeny, judges now must consider all of the kinds of sentences available by statute (§3553(a)(3)) even if the "kinds of sentence ...established [by] the Guidelines" permit or encourage only prison.  See, *Gall, supra,* at 602 and n. 11.  Judges can feel confident in imposing a non-prison sentence based on past practice, the Sentencing Reform Act, the Commission's own research [2]

---

[2] The Sentencing Commission, apparently, is getting the message that probation has been under used. It issued a report in 2009 which states: "Effective alternative sanctions are important options for federal state and local criminal justice systems. For appropriate offenders alternatives to incarceration can provide a substitute for costly incarceration.  Ideally, alternatives also provide those offenders opportunities by diverting them from prison (or

and other credible research.

# **HISTORY AND CHARACTERISTICS OF ROBERT ESPINEL**

What follows in this part of this Memorandum is based on letters counsel has received from numerous people who know Robert Espinel and on discussions that counsel has had with a number of individuals about Robert. It is also based on counsel's investigation of the case and the many hours that he personally has spent with Robert Espinel over the last year and a half. It is counsel's belief that the aforesaid letters are significant in opening a window to what kind of person Robert is. Counsel is confident that this Court will read each letter carefully and give all of them due consideration and due weight.

Robert Espinel, who is 49 years of age, is a hard-working, humble and unselfish person, from humble beginnings. He was born in Queens, New York and is one of four siblings child born to his parents, Alvaro and Judith Espinel. His siblings, Kenny Espinel, Dennis Espinel, and Diana Van Patten are very supportive of him, and he remains close to each of them. They have even accompanied him to many of his court appearances. When Robert was twelve years old, his parents divorced and his mother ultimately moved to Binghamton, New York. Robert remained in Queens with his father, and while he maintained a close relationship with both parents, he had a closer relationship with his father. Both of Robert's parents had an active role in raising their children and instilling in them family and life values, however, his father took over the primary parental roll when Robert was in his late teens. At this time, his father remarried and the family moved to Oceanside. Robert has two step-siblings whom he remains in contact with. In 2000, Roberts's mother died. His father currently lives in Sun City West, Arizona and is retired from his long career at Canada Dry.

---

reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society." U.S.S.C.. *Alternative* sentencing *in the Federal Criminal Justice System,* at 2-3(Jan. 2009). This is further evidenced more recently by the Commission amending the Guidelines by adding a new application note to the commentary at §5C1.1 to endorse sentences other than imprisonment for "nonviolent first offender[s]" falling within Zones A and B of the Sentencing Table. See U.S. Sentencing Commission, Adopted Amendments to the Guidelines (effective Nov. 1, 2018) at 29-30.

Robert maintains a very close relationship with his father.

Ever since Robert was a young man, he wanted to become a police officer. In 1995, his dream was realized, and he entered the NYPD academy. He worked in the 102nd Precinct in Richmond Hill, New York from March 1996 until 2012. In 2012, he was transferred to the Licensing Division at NYPD Headquarters, located at One Police Plaza in New York, New York. While on the job, Robert received a commendation for integrity, a Meritorious Award, and was Cop of the Month twice.

In 1997, while working in the 102nd Precinct Robert was invited to celebrate the engagement of a fellow officer, Andrew Walsh. At that party, Robert met Andrew's sister Jennifer and they started dating. They fell in love and ultimately married in 2000. Jennifer Espinel works as a court clerk in Queens Supreme Court. They have two girls, Emily and Allison Espinel, sixteen and fourteen years old, respectively. The Espinels are an extremely close and loving family. Robert has always had a very close relationship with both his daughters. He is very active in all aspects of their lives. Now that he is retired, it allows him even more time to dedicate to them, the rest of his extended family and his community. He spends time helping his daughters with their homework, and he drives them home from school every single day. Robert also provides rides for those children whose parents are unable to take them to practices and games, and he picks them up and takes them home from events. For many years, he has coached his daughters' softball teams. He volunteers for t the Seaford High Schools Booster Club, selling refreshments at school events in an effort to raise money for the school's athletic teams. He repairs and maintains the sports shack at the school by power washing it, painting it and repairing its roof. Robert volunteers to do this and leads by example. He has instilled these qualities in his daughters and teaches them to help others, as well.

As to Robert's concern for others, my interviews with individuals along with the letters in Exhibit A reflect his frequent willingness and genuine desire to help others. Whether mowing a neighbors lawn, shoveling and snow blowing some ones driveway when it snows, assisting others with yard work, organizing an Easter Egg hunt for neighborhood kids, looking after a neighbors pets, volunteering as an overnight security guard or helping with a home renovation,

Robert's kindness, generosity and concern for others have been constants throughout his life. One person. I spoke with put it simply, "Robert cannot see someone in need and stand by doing nothing to help, that's the way he is."

As counsel referenced earlier, in 1997, Robert realized his dream of becoming a NYC police officer. This became not only a means for Robert to better provide for his family, but a vehicle to help those in the community, and, in particular, those in need. I spoke with many different people who told me stories of how Robert helped them while on the job and donated his time away from work as a way to help every layer of the community. From helping "rookie" police officers and making them feel comfortable as they acclimated to the job, to providing rides and running errands for a fellow officer's family as that officer's four year old son was dying of cancer, a large part of Robert's personality is his concern for and desire to help others.

While on duty, Robert helped countless members of the community. One such instance was when Robert took it upon himself to clean up an abandoned corner store within his precinct located on Jamaica Avenue and Lefferts Boulavard. Aside from being a community eyesore, the abandoned store served as a breading ground for drug dealers, drug users and the homeless. The stench of urine and trash emanating from the store could be smelled a block away. Robert organized and recruited volunteers from the youth explorer  program and kids from Richmond Hill High School to clean up the store and surrounding area. Robert coordinated with the sanitation department to come and pick up mattresses and countless bags of garbage collected from in and around the store. He coordinated with the New York City Fire Department and arranged for them to come down and clean the site by hosing it down and cleaning with donated bleach. Robert got a fence company to donate a fence and hang "No Trespassing" signs to help keep the area clean and uninhabited. Robert not only bought pizza for all of the volunteers, he organized a group of officers to pool their money and buy twenty five Mets tickets to take the kids who volunteered to a Mets game. For the vast majority of these children, it was the first baseball game that they ever attended. This is one small sampling, which highlights the type of person Robert is. There are too many similar examples

to list in this memorandum.  Simply put, Robert has a difficult time standing by as an observer when people are in need.  He takes action and is always the first to offer a helping hand.

Another such example to be cited was the time  that he dedicated  to ground zero after the 9/11 attacks on the World Trade Center.  When the first plane hit the North Tower of the World Trade Center Robert was in Manhattan on an errand for the 102 precinct.  Because he was assigned in Queens, he was not required to respond to the scene.  Despite that, Robert worked his way to the Trade Center.  Before he arrived, the first Tower fell.  Knowing it was only a matter of time before the second Tower would fall, Robert insisted on helping and arrived on the scene to assist his fellow officers, New York City Fireman and civilians around the site.  As the second Tower fell, Robert was caught up in the giant cloud of smoke and ash, running around helping anyone he could escape to safety.

For weeks after 9/11, Robert continued working at Ground Zero.  He was immediately assigned to "working the pile". (searching through the debris, initially for survivors, and, then, for human remains).  He remained at Ground Zero for weeks.  His duties also consisted of working on the Heavy Equipment Detail, which required him to hand out equipment to law enforcement and volunteers "working the pile."  Because Robert had previous experience operating a forklift, he often worked a machine in order to move supplies and debris around.

One recurring theme in Robert's life, no matter who you ask, is that Robert cares about and helps others, going above and beyond while on the job as a New York City Police Officer and in civilian life.  I found this  true in my discussions with people, and it permeates the letters written on his behalf.  As detailed above, Robert is a genuinely good person and one of society's givers, not a taker.  He has been a positive influence in the lives of many and has made a difference for the better.  Robert has extended himself in unique and meaningful ways;  his good works were not just a matter of giving money, but of giving time, of giving of himself (at times risking his own life) and showing others that he genuinely cared.  That makes his good works exceptional.

# BASES FOR VARIANCE

It is respectfully submitted that the Guidelines sentence conflicts with the mandates of §3553(a) for the following reasons:

A. The purposes set forth in §3553(a)(2)(A) (that is, "to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense") are generally referred to collectively as "retribution." Retributive theory considers only a defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Retribution also focuses on the actor's degree of blameworthiness for past actions assessed according to the nature and seriousness of the harm caused and the degree of intent and role in the offense. Thus, the seriousness of the offense may be lessened, for example, if the crime was victimless or nonviolent or committed by a first offender—all of which, of course, apply in the instant case. *See,* 28 U.S.C. §994(j) (prison is usually inappropriate in "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense").

B. Section 3553(a)(2)(B) relates to the sentencing court taking into consideration the need for the sentence "to afford adequate deterrence to criminal conduct." The empirical research shows no relationship between sentence length and deterrence. The general research finding is that deterrence works in the sense that there probably is less crime with a criminal justice system than there would be without one. However, the question for the sentencing judge is one of marginal deterrence—that is, whether any particular quantum of punishment results in increased deterrence and, therefore, decreased crime. There is no evidence that increases in sentence length reduce crime through deterrence. Tonry, Michael, *Purposes and Functions*

13

*of Sentencing,* 34 Crime and Justice: A Review of Research 28-29 (2006). Further, in a study involving federal white collar offenders in the pre-Guidelines era, no difference was found between probation and imprisonment. That is, offenders given terms of probation were no more or less likely to re-offend than those given prison sentences. Weisburd, David, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995). Simply, offenders are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted and do not make decisions in the manner one might expect of rational decision makers. Robert Espinel's history and characteristics make it unlikely that he would commit another crime and, so, seeking to immediately deter him with a sentence of imprisonment is, respectfully, unnecessary.

C. Section 3554(a)(2)(C) requires a judge to consider the sentencing purpose based on the need to protect the public from further crimes of the defendant. This purpose has to do with (1) the defendant's risk of recidivism, and (2) the danger posed by the defendant. Robert Espinel's risk of recidivism is extremely low when you consider his history and characteristics. Further, research has shown defendants "over the age of forty exhibit markedly lower risks of recidivism in comparison to younger defendants". U.S.S.C., *Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines,* at 12, 28 (2004). Post- Booker courts, too, have noted that recidivism is markedly lower for older defendants. *United States v. Lucania,* 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005).

D. Section 3553(a)(2)(D) requires a sentencing judge to consider the need for the sentence "to

provide the defendant with needed educational or vocational training, medical care, or other
correctional treatment in the most effective manner." The matter of rehabilitation has been
discussed, *infra*. Robert Espinel is in need of no rehabilitation as described in this section
of the statute.

In the instant case, as set forth above, the Guideline sentence would be unsound, excessive and
contrary to law, policy and procedure which has evolved from the Supreme Court (and Second
Circuit) cases cited. The determination of an appropriate sentence in this case should place more
focus on Robert Espinel's personal history and characteristics, including, without limitation, his
very solid work ethic and history both on the job and at home, his contributions to his community,
his importance to his wife and children, his non-financial support of his family (ie essentially taking
on the role of homemaker, helping to allow his wife to work), his supportive family members,
community support, his overall generosity and benevolence, his age, his lack of criminal record, his
low recidivism risk, as well as the non-violent and victimless nature of the criminal conduct and the
fact that, in this case, a sentence of probation will satisfy all requirements of a just sentence.

While Robert will be the first to tell the Court that he is responsible for his actions and
understands there are consequences, he has already been punished by the collateral consequences of
his being prosecuted. He has been under severe stress for almost two years as a direct result of the
prosecution herein. Second, the defense of the charges has resulted in significant monetary cost to
Robert. Third, Robert is an extremely proud man who has worked hard for what he has
achieved as a police officer, as a family man and in reputation. This entire prosecution experience
has been a tremendous embarrassment to him. It is submitted that the foregoing should be given fair
and appropriate consideration in seeking to justify varying downward from the Guidelines.

Still another aspect of justification for a sentence of probation may be found in the fact that, in the
two years since Robert's arrest, there has been no further incident regarding a violation of the

15

law.  Robert has continued to work hard, help others and maintain his high standing in the community.  Additionally, he has been on pretrial Supervision since April 25, 2017 and has been fully compliant with all of the conditions and requirements of such supervision. (*See*, PSR, at page 6, para. 8.

# **CONCLUSION**

Based upon all that has been set forth herein, it is respectfully requested that this court sentence Robert Espinel to a non-Guidelines sentence of probation.  A balancing of the applicable sentencing factors set forth in §3553(a) demonstrates that the applicable Guidelines need not, indeed, respectfully, should not, be followed in this case.  As Justice Stevens put it, the Sentencing Commission "has not developed any standards or recommendations" for many individual characteristics, but "[t]hese are…matters that §3553(a) authorizes the sentencing judge to consider," even though they are "not ordinarily considered" under the Guidelines.  *Rita, supra,* at 2473 (Stevens, J., concurring).

It is respectfully submitted that Robert Espinel has earned the compassion of this Court, and it is respectfully urged that a sentence of probation, just and appropriate under the circumstances, be imposed.

Respectfully submitted,

JAMES ADAM PASCARELLA

Mineola, New York
April 14, 2019